IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Donnie O. Watson, ) | |
| ) | Civil Action No. 6:06-1078-WMC |
| Plaintiff, ) | |
| ) | **O R D E R** |
| vs. ) | |
| ) | |
| Michael J. Astrue, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |
| _____) | |

The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying his claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.

This case was referred to this court for disposition by order of the Honorable R. Bryan Harwell, United States District Judge, filed May 4, 2006, pursuant to 28 U.S.C. 636(c) and Fed.R.Civ.P. 73.

**ADMINISTRATIVE PROCEEDINGS**

The plaintiff filed applications for disability insurance benefits (DIB) and supplemental security income (SSI) benefits on November 21, 2002, alleging that he became unable to work on May 31, 2001. The applications were denied initially and on reconsideration by the Social Security Administration. On August 6, 2003, the plaintiff requested a hearing. The administrative law judge, before whom the plaintiff, his attorney, a witness and a vocational expert appeared on July 19, 2005, considered the case *de novo*,

and on July 28, 2005, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The administrative law judge's finding became the final decision of the Commissioner of Social Security when it was approved by the Appeals Council on March 23, 2006. The plaintiff then filed this action for judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the administrative law judge:

(1)    The claimant has not engaged in substantial gainful activity since May 31, 2002 (20 CFR §§ 404.1520(f) and 416.920(b)).

(2)    The claimant has the following severe impairment(s): a history of a cerebral vascular accident, dizziness and hypertension (20 CFR §§ 404.1520(c) and 416.920(c)).

(3)    The claimant does not have an impairment or combination of impairments that meets or medially equals one of the listed impairments in 20 CFR 404., Subpart P, Appendix 1, Regulation No. 4 (20 CFR §§ 404.1520(d) and 416.920(d)).

(4)    Upon careful consideration of the entire record, the undersigned finds that the claimant has the following residual functional capacity: a wide range of light work and that he is precluded from high stress job [sic], work involving intense concentration, climbing, balancing, working at unprotected heights or near dangerous machinery.

(5)    The claimant has past work as an industrial worker, distribution clerk, molding machine worker, doffer and warehouse worker.

(6)    The claimant was born on February 10, 2957 and was 44 years old on the alleged disability onset date and classified as a younger individual age 18-44 within the meaning of the regulations (20 CFR §§ 404.1563 and 416.963).

(7)    The claimant has at least a high school education and is able to communicate in English (20 CFR §§ 404.1564 and 416.964).

(8)    The claimant does not have any transferable skills (20 CFR §§ 404.1568 and 416.968).

2

(9)     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant number in the national economy (20 CFR §§ 404.1560(c), 404.960(c), and 416.966).

(10)     The claimant has not been under a "disability," as defined in the Social Security Act, from May 31, 2001 through the date of this decision (20 CFR §§ 404.1520(g) and 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."   42 U.S.C. §423(a).   "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing substantial gainful employment. 20 C.F.R. §404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. 20 C.F.R. §404.1503(a). *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

3

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. §423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Richardson v. Perales*, 402 U.S. 389 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that her

4

conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The record reveals that the plaintiff was 44 years old as of his alleged onset date and 48 years old on the date of the ALJ's decision (Tr. 48, 203, 219). He has a high school education (Tr. 66, 220) and past work experience as an industrial worker, distribution clerk, molding machine worker, doffer, and warehouse worker (Tr. 61, 69-76, 248-53).

On June 1, 2001, the plaintiff presented to Dr. Eric Johnson for elevated blood pressure and an inner ear infection. He reported that he smoked cigarettes. Dr. Johnson diagnosed vertigo and high blood pressure and prescribed medications (Tr. 166). Ten days later, the plaintiff returned to Dr. Johnson with complaints of dizziness, drowsiness, and balance problems. Dr. Johnson diagnosed allergies and prescribed medications (Tr. 168).

On June 13, 2001, the plaintiff saw Dr. Gregory Parsons complaining that his symptoms of dysequilibrium were unresolved. An audiological evaluation showed that the plaintiff had a mild high frequency sensorineural hearing loss. Dr. Parsons diagnosed an upper respiratory infection and prescribed medications (Tr. 162). The plaintiff returned to Dr. Johnson on June 18, 2001, for chest pain, shortness of breath, dizziness, drowsiness, distressed mood, and irritability. Dr. Johnson diagnosed what "sound[ed] like panic disorder" and prescribed Paxil (an anti-depressant) and Ativan (anti-anxiety medication) (Tr. 169). That same day, he saw Dr. Parsons again for unresolved symptoms. Dr. Parsons referred the plaintiff for brain MRI study, which was abnormal, and recommended that he see a neurologist (Tr. 162-63).

5

On July 9, 2001, the plaintiff saw Dr. Johnson, who reviewed his brain MRI study and diagnosed hypertension and dizziness due to ischemia in the pons (brain stem stroke).   Dr. Johnson recommended that the plaintiff continue his Paxil for stress and referred him to Dr. Dennis Gettelfinger, a neurologist, who saw the plaintiff that same day (Tr. 170).  The plaintiff told Dr. Gettelfinger that he smoked cigarettes.  Dr. Gettelfinger found that the plaintiff demonstrated no aphasia, dysarthria, dysnomia, or disturbances of orientation, recall, judgment, or reasoning.  Dr. Gettelfinger also found that the plaintiff's eye movements, facial sensation, facial movements, and neck muscle power were normal.  He noted that the plaintiff had intact extremity bulk, tone, power, and coordination.  He also noted that the plaintiff had secure gait, the ability to heel-toe walk with some extra effort for balance, and normal reflexes and peripheral sensation.  Dr. Gettelfinger concluded that, other than his "mildly effortful" gait for balance, the plaintiff's examination did not show any major abnormalities as a result of his pontine stroke.  He prescribed Plavix (medication for prevention of cerebrovascular events) and Ecotrin (aspirin).  He recommended smoking cessation, a cardiac evaluation, an MR angiogram, and a carotid ultrasound.  The plaintiff asked when he might be able to return to work as a chemical operator, but Dr. Gettelfinger said that he could not predict the future about his dizziness, that hopefully it would gradually improve.  He felt it was possible the plaintiff might have to seek some other kind of employment, and recommended that he contact Vocational Rehabilitation (Tr. 156-58).

On July 18, 2001, the plaintiff told the Village Oaks Family Practice Center that he wanted to be placed on total disability (Tr. 172).

On July 10, 2001, the plaintiff saw Dr. Vasant Patel for cardiac evaluation.  An electrocardiogram was normal.  Dr. Patel diagnosed "symptoms of posterior circulation stroke and an abnormal MRI" and recommended a transesophageal echocardiogram, which was normal (Tr. 148-50, 152).

6

On July 25, 2001, Dr. Gettelfinger noted that an MR angiogram and carotid ultrasound studies were also normal. He also noted that the plaintiff had no new symptoms of stroke, although he remained somewhat effortful in his balance. Dr. Gettelfinger found that the plaintiff had normal eye movements, visual fields, whisper hearing, facial movement, speech, palate, tongue, and extremity bulk, tone, power, and coordination. The plaintiff requested a note for unemployment insurance purposes indicating that he was able to work. Dr. Gettelfinger obliged the plaintiff, but noted that he "should not work in situations where his balance problem would be dangerous for him." He again recommended Vocational Rehabilitation and smoking cessation and continued the plaintiff's medications (Tr. 159-60).

On August 28, 2002, the plaintiff presented to the Community Medicine Foundation with complaints of headaches, dizziness, spotty vision, and high blood pressure. It was noted that the plaintiff's blood pressure was 160/110, too high for a 45-year-old male. It was also noted that he had been taking Lotrel, but that he was out of that medication (Tr. 134, 136). The plaintiff returned to the Community Medicine Foundation on December 11, 2002, where Dr. Desmond McGann saw him for follow-up. Dr. McGann found that the plaintiff's blood pressure was "too high" and that he weighed 274 pounds. He diagnosed "status post cerebrovascular accident without any brain syndrome" and stated that the plaintiff was "unemployable and [could] never work again" (Tr. 136).

On February 12, 2003, Dr. Edmund Gaines, Jr., examined the plaintiff at the request of the Commissioner. The plaintiff complained of history of a stroke, persistent balance problems, uncontrolled hypertension, and depression. He reported that he was separated from his wife and he lived with and took care of his mentally retarded brother, including doing the cooking and cleaning. Dr. Gaines found that the plaintiff had normal affect, could spell the word "world" forward and backward, performed serial sevens with no problems, adequately performed a cash transaction, and was well oriented. He also found

7

that the plaintiff weighed 267 pounds and had normal gait and full ranges of motion and strength in his extremities.  He noted that the plaintiff had intact cranial nerves, the ability to heel-toe and tandem walk, negative straight leg raising tests, and normal coordination and sensation.  Dr. Gaines diagnosed depression of unknown severity, cerebrovascular accident, and poorly controlled hypertension by history.  He stated that the plaintiff's "balance would be a problem only if he were to undertake any occupation that would be dangerous to himself or to another person where he did have a problem with balance" and that "a psychological evaluation [would] determine the depth of [his] depression" (Tr. 143-46).

On February 19, 2003, Dr. Seliam El Ibiary, a State agency physician, reviewed the medical evidence and found that the plaintiff could perform medium work[1] that did not require climbing of ladders, ropes, or scaffolds, or more than occasional climbing of ramps and stairs.  He also found that the plaintiff should avoid even moderate exposure to hazards (machinery, heights, etc.) (Tr. 91-98, 113-16).

On February 21, 2003, Larry Clanton, Ph.D., a State agency psychologist, reviewed the medical evidence and found that the plaintiff had an affective disorder and history of an anxiety-related disorder, but that these impairments did not result in any limitations on his activities of daily living, social functioning, or concentration, persistence, and pace.  He also found that the plaintiff had not experienced any episodes of decompensation.  Therefore, he found that the plaintiff did not have a severe mental impairment (Tr. 99-116).

On March 5, 2003, the plaintiff saw Kathleen Moser, a nurse practitioner, for high blood pressure.  Ms. Moser found that he had normal respiration and an obese abdomen.  She also found that he was ambulatory, had no extremity edema, and was alert

---

[1]"Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work." 20 C.F.R. §§ 404.1567(c), 416.967(c).

and oriented with intact cranial nerves and no paresthesia. She diagnosed abnormal electrocardiogram, hypertension, status post brain stem cerebrovascular accident in 2001 which was "stable," and tobacco abuse disorder. She prescribed Teveten (anti-hypertensive drug) and smoking cessation (Tr. 137).

On April 4, 2003, the plaintiff returned to Ms. Moser for treatment of his hypertension. He reported that he had muscular weakness and felt bad when he took Teveten. He also reported that he still smoked one pack of cigarettes per day. Ms. Moser diagnosed hypertension, tobacco abuse disorder, and status-post cerebrovascular accident. She replaced his Teveten with Norvasc, hydrochlorothiazide, and Clonidine (anti-hypertensive drugs) and recommended smoking cessation (Tr. 138).

On April 9, 2003, Ms. Moser noted that the plaintiff had an abnormal electrocardiogram and increased blood pressure and recommended a myoview stress test (Tr. 138).

On April 22, 2003, the plaintiff presented to Dr. Jacques Days for evaluation of his hypertension and obesity. Dr. Days noted that the plaintiff "ha[d] been using exercise and diet to help control his blood pressure and weight." The plaintiff told Dr. Days that he smoked one-half pack of cigarettes per day. Dr. Days noted that the plaintiff weighed 268 pounds and had a body-mass index of 35. He found that the plaintiff had regular heart rate and rhythm with blood pressure of 128/90. Dr. Days diagnosed hypertension with elevated diastolic pressure, tobacco abuse, and morbid obesity. He adjusted the plaintiff's medications and encouraged smoking cessation (Tr. 140).

On April 29, 2003, the plaintiff underwent a dobutamine cardiolite test which showed he had normal left ventricular cavity size and no increased lung uptake (Tr. 153). On May 5, 2003, he underwent a myoview stress test, which was "entirely normal" (Tr. 151).

9

On July 3, 2003, Dr. William Crosby, a State agency physician, reviewed the medical evidence and found that the plaintiff could perform medium work that did not require climbing of ladders, ropes, or scaffolds, more than occasional climbing of ramps and stairs and balancing, or more than frequent stooping, kneeling, crouching, or crawling. Dr. Crosby also found that the plaintiff should avoid even moderate exposure to hazards (machinery, heights, etc.) (Tr. 117-28).

Also on July 3, 2003, Renuka Harper, Ph.D., a State agency psychologist, reviewed the medical evidence and affirmed Dr. Clanton's February 2003 findings (Tr. 112, 125-28).

On February 16, 2004, the plaintiff saw Dr. Days again for follow-up. He complained of darkening of the skin on his neck, postnasal drainage, and numbness and tingling in his fingers and toes. Dr. Days diagnosed hypertension, hyperlipidemia, and late effects of a cerebrovascular accident and continued the plaintiff's medications (Tr. 194).

The plaintiff presented to the emergency room twice in June 2004 with complaints of facial pain. He was diagnosed with lymphadenitis and treated with medications (Tr. 173-80, 184-93, 196).

On September 3, 2004, Dr. Days stated that the plaintiff had persistent late effects of a cerebrovascular accident, dysequilibrium, impaired gait, and paresthesias that "would put him and coworkers at potential risk." He added that "anyone who demand[ed] that he go back to work should assume responsibility for any subsequent injuries" (Tr. 133).

On February 1, 2005, the plaintiff sought treatment for his medical problems from Dr. George Barron. He reported that he had been on Lipitor, but was not taking it. He also reported that he had been on Plavix, but was only taking aspirin at that point. He said that he continued to smoke one-half pack of cigarettes per day. He complained of shortness or breath, slurred speech, left arm numbness, and occasional chest discomfort. Dr. Barron

10

found that the plaintiff "appear[ed] well," was alert, moved all four extremities, climbed on to the examination table without difficulty, and had normal gait and symmetrical strength. He diagnosed cerebral vascular disease by history, hypertension under "fair control," hyperlipidemia, and tobacco abuse. He advised the plaintiff to continue taking aspirin and Lotrel and stop smoking (Tr. 197-202).

At the hearing, the plaintiff testified that he was six feet tall and weighed 260 pounds (Tr. 219-20). He admitted that he asked Dr. Gettelfinger to complete a statement in July 2001 indicating that he could work so that he could collect unemployment benefits (Tr. 223-24). He stated that he collected unemployment benefits for four months and attended several job interviews (Tr. 224). He further testified that he experienced dizzy spells and often saw "black spots" as a result of his high blood pressure (Tr. 225-26). He stated that he could not sit for long periods due to dizziness and headaches (Tr. 229). He also stated that he did not drive and that his wife drove him where he needed to go (Tr. 231). The plaintiff testified that he had fallen down, walked with a cane, and had balance problems, shortness of breath, slurred speech, and numbness and weakness in his arms (Tr. 232-35). He said that he could not stand or walk for longer than 15-20 minutes and that his legs ached (Tr. 236-38). He admitted that he sometimes forgot to take his medications and still had panic attacks (Tr. 237-39). He also said that he did little around the house due to his condition (Tr. 241).

The plaintiff's wife, Willie Mae Watson, testified that the plaintiff experienced dizzy spells, depression, and anxiety due to his limitations (Tr. 242-45). She also testified that the plaintiff required a walker or cane and still smoked cigarettes (Tr. 245-47).

The ALJ asked Robert Ballantyne, a vocational expert, the following hypothetical question:

> Now, assuming I find for a relevant 12-month period that the Claimant's exertional impairments would permit sedentary and

11

> some light work on a sustained basis . . . I would need to rule
> out jobs requiring any significant amount of climbing, balancing,
> exposure to unprotected heights or hazardous machinery.
> Assume also I would rule out high-stress jobs of a nature where
> production speed would be a factor of the jobs rather than
> dealing on a more routine basis with things or persons rather
> than large numbers of people or production pressures, and
> assume also a degree of chronic pain severe enough to rule out
> sustained skilled concentration limiting one to unskilled or semi-
> skilled concentration. If I were to place those non-exertional
> limitations on sedentary and light work for a male of 44 to 48
> with a high school educational level and the prior work to the
> extent it might be relevant, are there jobs such a person could
> do with those limitations?

(Tr. 253).  The vocational expert testified that such an individual could perform the unskilled

light jobs of cashier, storage facility rental clerk, and office equipment collator/inserter and

the unskilled sedentary job of parking lot cashier (Tr. 253-55).

## ANALYSIS

The plaintiff alleges disability since May 31, 2001, due to a brain stem stroke,

high blood pressure, unstable balance, and dizziness. The ALJ found that the plaintiff

retained the residual functional capacity ("RFC") to perform a wide range of light work and

that he was precluded from high-stress jobs, work involving intense concentration, climbing,

balancing, and working at unprotected heights or near dangerous machinery.  The plaintiff

argues that the ALJ erred by (1) failing to give proper weight to the opinions of his treating

physicians; (2) failing to properly assess his credibility; (3) failing to  fulfill his duty to develop

the record; (4) failing to comply with SSR 02-01p in not considering the impact of his obesity

on his ability to work; (5) failing to comply with SSR 96-8p in his RFC finding; (6) failing to

consider the combined effect of all of his impairments; and (7) rendering a decision that is

not supported by substantial evidence.

12

*Treating Physicians*

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. §416.927(d)(2) (2006); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). However, statements that a patient is "disabled" or "unable to work" or meets the Listing requirements or similar statements are not medical opinions. These are administrative findings reserved for the Commissioner's determination. SSR 96-2p. Furthermore, even if the plaintiff can produce conflicting evidence which might have resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supported the decision. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

The regulations provide that even if an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he still must consider the weight given to the physician's opinion by applying five factors: (1) the length of the treatment relationship and the frequency of the examinations; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4) the consistency of the opinion; and (5) whether the physician is a specialist in the area in which he is rendering an opinion. 20 C.F.R. §404.1527(d)(2)-(5). Social Security Ruling 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. SSR 96-2p, 1996 WL 374188, *5. As stated in Social Security Ruling 96-2p:

> A finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927. In many

13

> cases, a treating source's opinion will be entitled to the greatest
> weight and should be adopted, even if it does not meet the test
> for controlling weight.

*Id.* 1996 WL 374188, *4.

Dr. McGann stated the following in a treatment progress noted dated December 11, 2002:  "Final Diagnosis: Status post cerebrovascular accident without any brain syndrome, in my opinion this man is unemployable and can never work again" (Tr. 136).  The ALJ stated that "little weight" was given to Dr. McGann's opinion as it was "not supported by the clinical findings of record" (Tr. 19).

In a letter dated September 3, 2004, Dr. Days stated: "Mr. Donnie O. Watson has persistent late effects of his previous cerebrovascular accident.  He has dysequilibrium, impaired gait, and paresthesia which would put him and coworkers at potential risk.  Anyone who demands that he go back to work should assume responsibility for any injuries" (Tr. 133).  The ALJ does not discuss the opinion of Dr. Days in his decision, nor does he provide reasons for its rejection.

This court agrees with the plaintiff that the ALJ's failure to provide specific reasons for rejecting the opinions of the plaintiff's treating physicians is cause for remand.  Upon remand, the ALJ is directed to evaluate the opinions of the plaintiff's treating physicians in accordance with the above-cited law.  If the ALJ finds that a particular opinion is not entitled to controlling weight, he should still consider the weight to be given to that opinion by applying the factors cited above.

### *Credibility*

The plaintiff next argues that the ALJ failed to properly assess his credibility. A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical

14

evidence and other evidence. 20 C.F.R. §§404.1529(c)(4) and 416.929(c)(4). Furthermore,

"a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ

"sets forth the specific evidence [he] relies on in evaluating the claimant's credibility." *White

v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001). Social Security Ruling 96-7p states that

the ALJ's decision "must contain specific reasons for the finding on credibility, supported by

the evidence in the case record." Furthermore, it "must be sufficiently specific to make clear

to the individual and to any subsequent reviewers the weight the adjudicator gave to the

individual's statements and reasons for that weight." SSR 96-7p, 1996 WL 374186, *4.

In addition to the objective medical evidence, the factors to be considered by

an ALJ when assessing the credibility of an individual's statements include the following:

(1)    the individual's daily activities;

(2)    the location, duration, frequency, and intensity of the
individual's pain or other symptoms;

(3)    factors that precipitate and aggravate the symptoms;

(4)    the type, dosage, effectiveness, and side effects of any
medication the individual takes or has taken to alleviate
pain or other symptoms;

(5)    treatment, other than medication, the individual receives
or has received for relief of pain or other symptoms;

(6)    any measures other than treatment the individual uses or
has used to relieve pain or other symptoms (e.g., lying
flat on his or her back, standing for 15 to 20 minutes
every hour, or sleeping on a board); and

(7)    any other factors concerning the individual's functional
limitations and restrictions due to pain or other
symptoms.

SSR 96-7p, 1996 WL 374186, *3.

The ALJ found as follows with regard to the plaintiff's credibility:

Upon considering the evidence of record, the undersigned finds
that the claimant's medically determinable impairments could

15

reasonably be expected to produce the alleged symptoms. However, the claimant's statements concerning the intensity, duration and limiting effects of these symptoms are not entirely credible.

At the hearing, the claimant testified that he continues to have episodes of dizziness and often sees black spots. He admitted that he had requested a statement from his physician stating that he could work so that he could receive unemployment benefits. He alleged problems with elevated blood pressure and stated that he could not stand for prolonged periods of time. He also said that he could not walk far and was afraid to drive a car. He admitted that he forgot to take medications sometimes. He indicated that his symptoms were worsening and he reported that he did little around the house due to his condition and could not return to work. His wife also testified and confirmed the claimant's dizzy spells. She also alleged that the claimant seemed depressed and anxious due to his limitations.

Considering the claimant's allegations of worsening symptoms, there is little, if any clinical findings to support this conclusion. Treatment notes indicate that when the claimant takes prescribed medication, his hypertension is under "fair control." In addition, diagnostic testing has not identified any specific cognitive limitations nor any brain syndrome related to the claimant's stroke. He has been advised to seek vocational rehabilitation by a treating source which would imply that the claimant is able to return to some type of work activity. Further cardiac testing were within normal limits and there [is] indication that the claimant has not been compliant in taking prescribed medications. Therefore, I cannot find his testimony to be fully credible with regard to allegations of marked limitations.

(Tr. 19).

This court agrees with the defendant that the ALJ properly evaluated the credibility of the plaintiff's subjective complaints as his opinion contained specific reasons for the finding on credibility, supported by the evidence in the case record.

### Development of the Record

The plaintiff argues that the ALJ did not properly develop the record because he "made no inquiry of the treating physicians as to [his] depression nor did he obtain a

16

consultative examination as to [his] mental state despite the fact this was recommended by the state agency physician" (pl. brief 15-16).  The ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record and cannot rely only on the evidence submitted by the plaintiff when that evidence is inadequate.

Dr. Johnson, the plaintiff's primary care physician, prescribed Paxil for depression and Ativan for anxiety in 2001 (Tr. 169-70).  However, the ALJ found that the evidence did not show that plaintiff had any specific mental limitations, nor did it show that he sought any further treatment for mental impairments (Tr. 18).  He also considered the findings of Drs. Clanton and Harper, the State agency psychologists who reviewed the medical evidence in February and July 2003, respectively, and reached the same conclusion (Tr. 19, 99-116, 125-28).  The plaintiff argues that the ALJ should have ordered a consultative examination to determine the extent of his mental limitations.  Dr. Gaines, who examined the plaintiff at the Commissioner's request, noted that he "had some problems with depression over his physical situation and [was] being treated for depression by Dr. McGann [sic] although this was started by Dr. Eric Johnson" (Tr. 144), and stated at the end of his report that "a psychological evaluation [would] determine the depth of [his] depression" (Tr. 145).  This court agrees that a mental evaluation would be helpful for adequate development of the record.  Accordingly, upon remand, the ALJ is directed to order a consultative examination as to the plaintiff's mental limitations.

### *Obesity*

Next, the plaintiff contends that the ALJ failed to properly consider his obesity in accordance with SSR 02-1p.  The ALJ found that the plaintiff's obesity was a severe impairment (Tr. 18).  He further stated that he had "evaluated the claimant's obesity in accordance with SSR 02-01p.  The evidence shows that the claimant's excess weight causes some difficulty in walking for extended periods of time and limits his ability to perform

strenuous physical exertion such as heavy lifting" (Tr. 19).  SSR 02-01p recognizes that

obesity can cause limitations of function in sitting, standing, walking, lifting, carrying,

pushing, pulling, climbing, balancing, stooping, crouching, manipulating, as well as the ability

to tolerate extreme heat, humidity, or hazards.  SSR 02-01p, 2000 WL 628049, *6. The

Ruling further states that "individuals with obesity may have problems with the ability to

sustain a function over time" and that "[i]n cases involving obesity, fatigue may affect the

individual's physical and mental ability to sustain work activity."  *Id.*  The Ruling also states:

> The combined effects if obesity with other impairments may be
> greater than might be expected without obesity. For example,
> someone with obesity and arthritis affecting a weight-bearing
> joint may have more pain and limitation than might be expected
> from the arthritis alone.

*Id.*  Further, "[a]s with any other impairment, we will explain how we reached our conclusions

on whether obesity caused any physical or mental limitations."  *Id.* at *7.  Upon remand, the

ALJ is instructed to consider whether obesity caused any physical or mental limitations *and*

explain how he reached his conclusion.


***Residual Functional Capacity***

The plaintiff next argues that the ALJ erred by failing to explain the evidence

upon which he based the plaintiff's mental and physical residual functional capacities and

failed to consider his impairments in combination.

> The Residual Functional Capacity ("RFC") assessment must
> include a narrative discussion describing how the evidence
> supports each conclusion, citing specific medical facts (e.g.,
> laboratory findings) and nonmedical evidence (e.g., daily
> activities, observations). In assessing RFC, the adjudicator must
> discuss the individual's ability to perform sustained work
> activities in an ordinary work setting on a regular and continuing
> basis (i.e., 8 hours a day, for 5 days a week, or an equivalent
> work schedule), and describe the maximum amount of each
> work- related activity the individual can perform based on the
> evidence available in the case record. The adjudicator must also

18

> explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved. . . .

SSR 96-8p, 1996 WL 374184, *7.

In a disability case, the combined effect of all the claimant's impairments must be considered without regard to whether any such impairment if considered separately would be sufficiently disabling. Where there is a combination of impairments, the issue "is not only the existence of the problems, but also the degree of their severity, and whether, together, they impaired the claimant's 'ability to engage in substantial gainful activity.'" *Oppenheim v. Finch*, 495 F.2d 396, 398 (4th Cir. 1974). The ailments should not be fractionalized and considered in isolation, but considered in combination to determine the impact on the ability of the claimant to engage in substantial gainful activity. *Id.* The cumulative or synergistic effect of the various impairments on the claimant's ability to work must be analyzed. *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983).

The ALJ found the plaintiff was restricted to "a wide range of light work and that he is precluded from high stress jobs, work involving intense concentration, climbing, balancing, working at unprotected heights or near dangerous machinery" (Tr. 18). The ALJ failed to identify the plaintiff's functional limitations and assess his work-related abilities on a function-by-function basis. Upon remand, the ALJ is instructed to explain his RFC assessment in accordance with the above-cited law. Further, in making his RFC assessment, the ALJ should be instructed to consider all of the plaintiff's impairments, even those that are not severe, in combination.

The plaintiff also argues that the ALJ erred by failing to obtain an explanation from the vocational expert for any conflict with the *Dictionary of Occupational Titles* ("DOT").

Social Security Ruling 00-4p provides in pertinent part:

> When a VE . . . provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that VE

19

> . . . evidence and information provided in the DOT. In these situations, the adjudicator will:
>
> Ask the VE . . . if the evidence he or she has provided conflicts with information provided in the DOT; and
>
> If the VE's . . . evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict.

SSR 00-4p, 2000 WL 1898704, *3.

The ALJ found that the vocational expert's testimony was in accordance with SSR 00-4p. However, as argued by the plaintiff, the ALJ did not ask the vocational expert whether his testimony was consistent with the DOT, as required by SSR 00-4p. Accordingly, upon remand, the ALJ is directed to ask the vocational expert whether the evidence provided conflicts with information provided in the DOT, and if the evidence appears to conflict with the DOT, the ALJ is to obtain a reasonable explanation for the apparent conflict.

## CONCLUSION

Based upon the foregoing, the Commissioner's decision is reversed under sentence four of 42 U.S.C. § 405(g), with a remand of the cause to the Commissioner for further proceedings as discussed above.

IT IS SO ORDERED.

s/William M. Catoe
United States Magistrate Judge

August 23, 2007

Greenville, South Carolina

20